IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

IN THE MATTER OF THE SEARCH OF
THE SUBJECT LOCATIONS AND THE
SUBJECT VEHICLES

Case No. 13-1720 SKG - 13-1723 SKG
13-1729 SKG - 13-1730 SKG

## AFFIDAVIT OF MATTHEW P. LUCK IN SUPPORT OF APPLICATION FOR SEARCH AND SEIZURE WARRANTS

### I.  AFFIANT AND EXPERTISE

1.     I, Special Agent  Matthew P. Lucik, am an investigative or law enforcement officer of the United States within the meaning of 18 U.S.C. § 2510(7), that is, an officer of the United States who is empowered by law to conduct investigations of, and to make arrests for, offenses enumerated in 18 U.S.C. § 2516.

2.     I am a Special Agent with the United States Department of Justice, Drug Enforcement Administration (DEA).  I have been so employed since February 2012.  I am currently assigned to the High Intensity Drug Trafficking Area (HIDTA) Violent Trafficker's Initiative, Group 51, of the Baltimore District Office.

3.     After joining the DEA, I attended the Basic Agent Training Program, a 17-week resident program that included academic instruction in the basics of report writing, law, firearms, surveillance techniques, interview and interrogation techniques, automated information systems, drug identification, and defensive tactics, as well as leadership and ethics.  During my assignment to the HIDTA Violent Trafficker's Initiative, Group 51, of the Baltimore District Office, I have also spoken on numerous occasions with informants, suspects, and experienced narcotics investigators concerning the manner, means, methods, and practices that drug

traffickers use to further the operation of their drug trafficking organizations and the most

effective methods of investigating and dismantling such organizations.

4.      Based on my training, knowledge, and experience, I know that persons involved

in the illegal distribution of narcotics, or money laundering/structuring in relation to narcotics,

often keep and maintain records of their various illegal activities.  Experience in similar cases

has demonstrated that such records are regularly concealed in a suspect's automobile, residence,

office, on his person, in warehouses and storage lockers or storage units, and that they take

various forms.  Documents commonly concealed by traffickers, or those involved in money

laundering/structuring in relation to narcotics,  include but are not limited to notes in code,

deposit slips, wired money transactions, savings pass books, hidden bank accounts, photographs

of co-conspirators, various forms of commercial paper, personal address books, notebooks,

records, receipts, ledgers, travel receipts (rental receipts, airline tickets, bus tickets, and/or train

tickets), money orders and other papers relating to the ordering, transportation, sale and

distribution of controlled dangerous substances.  The aforementioned items are kept in locations

that are considered safe by the drug traffickers or money launderers, such as safety deposit

boxes, residences, sheds, outbuildings, stash houses, warehouses, storage units, vehicles.  I know

that drug traffickers often maintain several residences in order to decrease the likelihood of

detection by law enforcement.

5.      In addition, based on my knowledge, training and experience, I know that drug

traffickers often use cellular telephones, communication devices, and other electronic media to

further their illegal activities, and that they frequently maintain numerous such devices to conceal and compartmentalize such activities.

6.      The facts contained in this affidavit are based on my personal knowledge, as well as that of the other agents involved in this investigation.  All observations that were not made personally by me were related to me by persons with knowledge.  This affidavit is intended to show merely that there is sufficient probable cause for the requested warrants; it does not set forth all of my knowledge about this matter.

## II.    LOCATIONS AND VEHICLES TO BE SEARCHED

7.      This affidavit is submitted in support of an application to search the locations and vehicles described below.  The subject locations and vehicles relate to the following investigative subjects:

### A.    INVESTIGATIVE SUBJECTS

a. **Paul Rodney CAIN**, DOB 12/29/1965, white male, 6'5", 270, gray hair, brown eyes. CAIN resides at 8469 Kenton Road, Pasadena, MD, 21122—one of the subject locations described below.  CAIN has a 2012 conviction for possession of a substance other than marijuana.



b.  **Julie Marie GARDNER**, DOB 05/16/1978, white female, 5'5", 140, blonde hair, blue eyes.  GARDNER resides at 8469 Kenton Road, Pasadena, MD 21122—one of the subject locations described below.  GARDNER has not been convicted of a crime.



c.  **Randall Lee CAIN**, DOB 03/06/1954, white male, 6'2", 290, gray hair, green eyes.  CAIN resides at 25 Lake Shore Drive, Pasadena, MD 21122—one of the subject locations described below.  CAIN has convictions for possession of a controlled dangerous substance and paraphernalia (1997) and possession of a controlled dangerous substance (1996).



4

d.  **Allan Clay FERDOCK**, DOB 08/17/1957, white male, 6'1", 215, blonde hair, hazel eyes. FERDOCK resides at 8387 Baltimore Annapolis Boulevard, Pasadena, MD, 21122—a subject location described below. FERDOCK has convictions for possession of a controlled dangerous substance (1994) and manufacture/distribution of a controlled dangerous substance (1989). As described in further detail below, FERDOCK is currently charged in state court with possession with intent to distribute cocaine.



f.  **Daryell Mitchell REXRODE**, DOB 10/19/1957, white male, 5'8", 190, bald, hazel eyes. REXRODE resides at 8052 Croydon Way, Pasadena, MD, 21122—one of the subject locations described below. REXRODE has convictions for possession of a firearm by a convicted felon (2002), possession of a controlled dangerous substance (2001), robbery (February 1984), Robbery (May 1984), and possession with intent to distribute PCP (1981). As described in further detail below, REXRODE was arrested by federal agents in November 2012 upon arriving to accept a controlled delivery of one kilogram of cocaine.



5

**B.     SUBJECT LOCATIONS**

a.  **8469 Kenton Road, Pasadena, MD 21122** is described as a single-family home with stone work on the porch and foundation. The home has tan siding, white shutters, and a white front door. There is a silver mailbox in the front yard and a detached shed in the back yard. This is the residence of Paul CAIN and Julie GARDNER.



b.  **25 Lake Shore Drive, Pasadena, MD 21122** is described as a single family home with tan siding and green shutters. The numbers "25" are posted in black on a mailbox that sits at the end of the driveway. There is a detached two-car garage at the end of the driveway. This is the residence of Randall CAIN.



6

c. **8387 Baltimore Annapolis Boulevard, Pasadena, MD 21122** is described as an apartment above a white cinder block building. The apartment is accessed via wooden stairs leading to a white framed sliding glass door. There are no numbers visibly marking the dwelling. This is the residence of Allan FERDOCK.



d. **8052 Croydon Way, Pasadena, MD 21122** is described as a two-story townhome with dark tan siding and brown shutters. The numbers "8052" are posted in black above the front door. This is the residence of Daryell REXRODE.



.7

### C.   SUBJECT VEHICLES

a. **2000 Ford Truck** (green over tan), bearing Maryland registration 11S245 and registered to Paul CAIN.



b. **2000 Jeep Cherokee** (black), bearing Maryland registration 2AS1176 and registered to Allan FERDOCK.



8

c. **2000 Ford Van** (white), with "Commercial Building Sevices" written on the side, bearing Maryland registration 42J169 and registered to Daryell REXRODE.



### III.    **PROBABLE CAUSE**

7.      The DEA and the Anne Arundel County Police Department have been investigating a drug trafficking conspiracy involving CAIN and the INVESTIGATIVE SUBJECTS since late 2012. The investigation has employed a variety of measures, including confidential source debriefings; numerous controlled purchases; one controlled delivery; wire taps on two cellular telephones belonging to CAIN; and real-time surveillance of CAIN and others. As a result of these efforts, investigators believe that the individuals identified above and discussed in further detail below are involved in trafficking bulk quantities of cocaine in and around Anne Arundel County, and/or laundering the proceeds of their narcotics sales.

## November 2012 Controlled Delivery Involving REXRODE

8.     On November 16, 2012, REXRODE was arrested upon arriving to accept a controlled delivery of one kilogram of cocaine. The package containing the cocaine was shipped from California and addressed to REXRODE at 818 Waterview Drive, Baltimore, MD 21226. While the package was en route to this address, it was intercepted by Detective Holly Howell, a K-9 officer with San Bernardino (CA) Sheriff's Office. Howell notified DEA that the package contained cocaine, and she sent the package to DEA so that federal agents could conduct a controlled delivery.

9.     DEA conducted the controlled delivery at the 818 Waterview Drive address on November 16, 2012. When REXRODE arrived at this address to accept the package, law enforcement officers placed him under arrest. After REXRODE was arrested, law enforcement officers searched his vehicle and discovered approximately 344 grams of cocaine, 711.8 grams of methamphetamine, 463.7 grams of marijuana, 62.2 grams of heroin and an unspecified quantity of prescription medication. These substances were field tested and sent to the Anne Arundel County Police Department drug laboratory for confirmatory testing. The testing confirmed that the substances were, in fact, cocaine, methamphetamine, marijuana, and heroin, respectively.

10.     After his arrest, and after being advised of his Miranda rights by law enforcement officers, REXRODE stated that he was going to take the inbound package of cocaine to his home at 8052 Croydon Way, where he intended to split the package of cocaine with CAIN. REXRODE further stated that the methamphetamine found in his vehicle belonged to CAIN.

11.    REXRODE was charged in state court with multiple drug-related offenses in connection with the controlled delivery described above.  The state charges were nolle prossed on April 29, 2013.

**Confidential Sources**



**Controlled Purchases**

15.    Acting on the information provided by ▮▮▮▮, law enforcement officers executed five controlled purchases—▮▮▮▮▮, and four by an undercover officer (UC-1)—from CAIN.  Those controlled purchases are summarized briefly below.  Following each of these purchases, law enforcement confirmed, via field testing, that the suspected cocaine purchased by CS-1 and UC-1 from CAIN was, in fact, cocaine.



a. ████████████████████████████████████████

b.  On March 14, 2013, UC-1 purchased approximately 15.0 grams of cocaine from
    CAIN at the Brass Rail Pub. UC-1 arranged the transaction by exchanging text
    messages with CAIN, who was then using the telephone number 443-440-7666.
    In one of the text messages, UC-1 told CAIN that he needed "a half cake," a
    coded reference to one half ounce of cocaine. CAIN agreed to meet UC-1 at the
    "bar," i.e., the Brass Rail Pub, at 9:30 p.m. Later that evening, UC-1 arrived at
    the bar and completed the purchase from CAIN.

c.  On March 27, 2013, UC-1 purchased approximately 15.0 grams of cocaine from
    CAIN at the Brass Rail Pub. UC-1 arranged the transaction during one recorded
    conversation and a subsequent exchange of text messages with CAIN, who was
    then using telephone number 443-440-7666. During the recorded conversation,
    which took place on March 26, 2013, UC-1 inquired with CAIN about purchasing
    one half ounce of cocaine for $600.00. CAIN told UC-1 that he would have the
    cocaine available and would meet with UC-1 the following evening at the Brass
    Rail Pub. UC-1 confirmed the meeting by text message the next afternoon, and
    he met with CAIN that evening to complete the purchase.

d.  On April 10, 2013, UC-1 purchased approximately 15.0 grams of cocaine from CAIN at the Brass Rail Pub.  UC-1 arranged the transaction during a recorded conversation with CAIN, who was then using telephone number 443-440-7666. During the recorded conversation, which took place on April 9, 2013, UC-1 asked CAIN if he was going to be around the following day.  CAIN responded that he would be "up there," i.e., at the Brass Rail Pub, at "the same time."  UC-1 then stated that he wanted "the same thing," i.e., one half ounce of cocaine, and CAIN agreed.  UC-1 completed the purchase from CAIN the following evening.

e.  On April 23, 2013, UC-1 purchased approximately 28.6 grams of cocaine from CAIN at the Brass Rail Pub.  UC-1 arranged the transaction during a recorded conversation with CAIN, who was then using telephone number 443-440-7666. During the recorded conversation, which took place on April 22, 2013, UC-1 inquired with CAIN about purchasing "a whole one," i.e., one ounce of cocaine. CAIN told UC-1 that he would have the cocaine available and would meet with UC-1 the following evening at the Brass Rail Pub.  UC-1 met with CAIN the following evening and completed the purchase for $1100.00.

**Title III Investigation**

16.     On May 15, 2013, the Honorable James K. Bredar, United States District Judge, authorized the interception of wire and electronic communications occurring to and from the cellular telephone bearing call number 443-440-7666 (TARGET TELEPHONE #1), which was

then being utilized by CAIN. As discussed below, interception concluded on May 29, 2013 because CAIN stopped utilizing TARGET TELEPHONE #1.

17.     On June 19, 2013, the Honorable James K. Bredar, United States District Judge, authorized the interception of wire and electronic communications occurring to and from the cellular telephone bearing call number 443-924-8422 (TARGET TELEPHONE #2), which was then being utilized by CAIN. As discussed below, interception concluded on July 1, 2013 because CAIN stopped utilizing TARGET TELEPHONE #2.

18.     During the wiretap phase of the investigation, the United States intercepted telephone calls and text messages between CAIN and the INVESTIGATIVE SUBJECTS relating to the distribution of cocaine. Based on my training, knowledge, and experience, I believe that the intercepted communications, in conjunction with real-time surveillance, establish the following:

> a. CAIN and REXRODE are partners and assist one another in purchasing large quantities of cocaine and potentially other substances.
>
> b. CAIN is distributing narcotics to multiple customers in Anne Arundel County, including his brother, Randall CAIN.
>
> c. CAIN's girlfriend, Julie GARDNER, assists him by meeting with customers and packaging narcotics for distribution.
>
> d. Towards the end of the first interception period, CAIN agreed to purchase one kilogram of cocaine from FERDOCK, which he intended to share with REXRODE. FERDOCK, in turn, obtained the kilogram from JACOBS.

14

e. On May 24, 2013, law enforcement officers intercepted the shipment that FERDOCK was supposed to deliver to CAIN. After the shipment was intercepted, CAIN contacted FERDOCK and demanded that FERDOCK either refund his money or deliver his drugs.

f. After learning that FERDOCK would not be delivering their drugs, CAIN and REXRODE enlisted REXRODE's brother, David REXRODE, to confront FERDOCK about the missing drugs, which CAIN and Daryell REXRODE believed—erroneously—had not been confiscated by law enforcement.

g. On May 26, 2013, CAIN drove David REXRODE to FERDOCK's residence and left him in the woods on FERDOCK's property, where he was later found and arrested by police officers.

h. When the police found David REXRODE on FERDOCK's property, he was wearing latex gloves and carrying a knife, duct tape, and a blunt object that officers described as a mallet.

g. After David REXRODE was arrested, and after FERDOCK was arrested in connection with the intercepted shipment, CAIN stopped using TARGET TELEPHONE #1 and started using TARGET TELEPHONE #2 instead.

15

████████████████████████████████

19.     Below are excerpts of intercepted communications between CAIN and the

INVESTIGATIVE SUBJECTS occurring over TARGET TELEPHONES 1 and 2. The excerpts

are organized as follows: (i) conversations between CAIN and GARDNER, which establish that

GARDNER is knowingly assisting CAIN in distributing cocaine; (ii) conversations between

CAIN and his brother, Randall CAIN, as well as accounts of contemporaneous surveillance,

which establish that Randall CAIN is one of Paul CAIN's customers; (iii) conversations between

CAIN and FERDOCK, and later between CAIN and Daryell REXRODE (as well as accounts of

contemporaneous surveillance), regarding the kilogram shipment of cocaine that FERDOCK was

supposed to deliver on May 24, 2013; (iv) additional conversations between CAIN and

REXRODE, including a conversation regarding CAIN's intention to stop using TARGET

TELPEHONE #1 and begin using TARGET TELEPHONE #2 instead; and ████████████

████████████████████████████████

### A. Conversations Between CAIN and GARDNER

20.     On May 16, 2013, at approximately 9:56 p.m., the United States intercepted a call

between CAIN and GARDNER. During the call, CAIN asked GARDNER to stop by his

location, the Brass Rail Pub, if GARDNER decided to go out. CAIN explained that he needed

"14," and he asked whether GARDNER would bring it to him or whether he needed to return

home and get it himself. GARDNER agreed to deliver the "14" to CAIN. She then asked CAIN

16

whether there was enough, and CAIN confirmed that there was. GARDNER also asked whether the "14" was bagged. CAIN responded that GARDNER would have to bag it herself. He further explained that GARDNER could find it in "the big one." He then instructed GARDNER put it on "the clear thing just to be sure."

21. Based on my training, knowledge and experience, I have interpreted the conversation described above as follows: (i) CAIN was asking GARDNER to deliver 14 grams of cocaine, or one half ounce, to his location; (ii) CAIN was informing GARDNER that the cocaine was not packaged for distribution and that GARDNER would have to package it herself; and (iii) CAIN was instructing GARDNER to weigh the quantities that she packaged.

22. On May 17, 2013, at approximately 9:35 p.m., the United States intercepted a call between CAIN and GARDNER. During the call, CAIN asked GARDNER what she was doing. GARDNER responded that she was on the phone with her mother. CAIN asked whether GARDNER was going anywhere, and GARDNER responded that she was not. CAIN asked GARDNER to sit on the porch because an unknown individual was going to "swing by." GARDNER asked CAIN whether "it" was already made. CAIN responded that "it" was not made, but that all GARNDER had to make was "28." GARDNER asked CAIN for 15 minutes. CAIN agreed.

23. Based on my training, knowledge and experience, I have interpreted the conversation described above as follows: (i) CAIN informed GARDNER that an unknown individual would be coming by their residence to pick up 28 grams, or one ounce, of cocaine; (ii) GARDNER was going to wait on the porch to deliver the 28 grams of cocaine to the unknown

individual; and (iii) the 28 grams of cocaine had not been prepared for distribution, meaning that GARDNER would have to prepare them for distribution herself.

### B. Conversations Between Paul CAIN and Randall CAIN and Related Surveillance

24.     On May 20, 2013, at approximately 5:35 p.m., the United States intercepted a call between Paul CAIN and Randall CAIN, also known as "Woody." During the call, Randall CAIN asked Paul CAIN whether he could stop by his (Randall's) house because he was going on a road trip and needed "the hook up for Lisa," as well as "another two." Paul CAIN asked Randall CAIN whether he wanted two "little ones." Randall CAIN responded that he wanted "two regular"; he then stated that he would straighten things out with Paul CAIN when he got back from his trip. Paul CAIN agreed, and he told Randall CAIN that he would stop by his house on the way to the bar.

25.     Based on my training, knowledge and experience, I have interpreted the conversation described above as follows: (i) Randall CAIN asked PAUL CAIN for an amount of narcotics for himself and an unidentified female named Lisa; (ii) Paul CAIN agreed to drop off the narcotics at Randall CAIN's house; and (iii) Randall CAIN told Paul CAIN that he would pay for the narcotics after he returned from his trip.

26.     On May 20, 2013, at approximately 6:06 p.m., the United States intercepted a call between Paul CAIN and Randall CAIN. During the call, Paul CAIN asked Randall CAIN whether he was home. Randall CAIN responded that he was. Paul CAIN then told Randall CAIN that he was on his way.

27.     Based on my training, knowledge and experience, I believe that during this call, Paul CAIN was telling Randall CAIN that he was on his way to Randall CAIN's house to deliver the narcotics referenced in the call described above.

28.     On May 20, 2013, in reference to the calls described above, law enforcement officers conducted surveillance of CAIN, who was driving his 2000 Ford pickup, one of the subject vehicles described herein, in the Pasadena, MD area. The officers observed CAIN driving onto Mountain Road, turning onto Lake Shore Road, and pulling into a driveway at 25 Lake Shore Road. The officers then observed CAIN and GARDNER exiting the 2000 Ford pickup and meeting with Randall CAIN in the driveway. The meeting lasted less than five minutes. Based on my training, knowledge, and experience, as well as the intercepted calls set forth above, I believe that during this meeting, CAIN was delivering narcotics to Randall CAIN.

### C.  Conversations and Surveillance Relating to the Kilogram Shipment of Cocaine From Allan FERDOCK to Paul CAIN

29.     On May 21, 2013, at approximately 11:44 a.m., the United States intercepted an incoming voicemail left by FERDOCK for CAIN. FERDOCK stated that "they" were "callin[g] him," and that he (FERDOCK) needed to know "how many to get. Based on my training, knowledge, and experience, I believe that in this voicemail, FERDOCK was telling CAIN that he needed to inform his source of supply regarding the quantity of drugs that CAIN wanted to purchase.

30.     On May 21, 2013, at approximately 6:04 p.m., the United States intercepted a call between CAIN and FERDOCK. During the call, CAIN asked FERDOCK whether he could "still grab one of them." FERDOCK responded that he had "talked to him today and he['s]

probably getting some." CAIN told FERDOCK that if he (FERDOCK) could "go ahead and grab one" for him, he would appreciate it. FERDOCK responded that he was not sure "what the price is," because "he wants to take five but he won't fuckin' take five." FERDOCK then stated that he would go ahead and "get ya one."

31. Based on my training, knowledge, and experience, I have interpreted the conversation described above as follows: (1) CAIN ordered one kilogram of cocaine from FERDOCK; (2) FERDOCK told CAIN that he had spoken to his source of supply, and that the source was getting a quantity of cocaine; and (3) FERDOCK was uncertain as to how much the kilogram would cost.

32. On May 23, 2013, at approximately 8:29 p.m., the United States intercepted a call between CAIN and FERDOCK. During the call, FERDOCK informed CAIN that he intended to "get ya tonight and have that for ya tomorrow early afternoon." CAIN asked FERDOCK "how much?" FERDOCK responded "36." FERDOCK later explained that "36" was "cost," because "he had to get four for that." FERDOCK further explained that "he could have got it for 35-5, if he could do six, but he didn't got the money for six." FERDOCK stated that "he" was hoping that CAIN's "shit" would "come through," because "he" was "tired of dealing with these people." CAIN then asked FERDOCK if they could meet "at the [ ] bar around 9:30," and FERDOCK agreed.

33. Based on my training, knowledge, and experience, I have interpreted the conversation described above as follows: (1) FERDOCK wanted to meet with CAIN to pick up $36,000 in exchange for one kilogram of cocaine; (2) FERDOCK's source of

20

supply had gotten four kilograms of cocaine, but if the source was able to get two more kilograms, CAIN could purchase his kilogram for $35,500 instead of $36,000; (3) CAIN had arranged another purchase with a different source of supply; and (4) CAIN agreed to pay FERDOCK $36,000 that evening at the Brass Rail Pub in Pasadena, MD.

34.    On May 23, 2013, in reference to the intercepted calls set forth above, law enforcement officers established surveillance of CAIN at his residence, which is located at 8469 Kenton Road in Pasadena, MD (a subject premises described herein). The officers followed CAIN as he drove from his residence to the Brass Rail Pub. The officers saw CAIN enter the pub. A short time later, the officers observed a dark green van, which investigators believe is used by FERDOCK, enter the parking lot outside the pub. The van parked in a spot immediately next to CAIN's vehicle. Approximately two minutes later, the van exited the parking spot and departed the area.

35.    Based on my training, knowledge, and experience, as well as reports from officers who conducted the surveillance described above, I believe that FERDOCK pulled into the parking lot and removed $36,000 from CAIN's vehicle, which CAIN had left for FERDOCK in exchange for the kilogram shipment of cocaine that FERDOCK intended to deliver the following day.

36.    On May 24, 2013, also in reference to the intercepted calls set forth above, law enforcement officers established surveillance of FERDOCK at 8387 Baltimore Annapolis Boulevard in Pasadena, MD (a subject premises described herein). At approximately 11:30 a.m., the officers observed FERDOCK departing this location in a 2000 Jeep Grand Cherokee,

21

Maryland registration 2AS1176 (a subject vehicle described herein). The officers followed FERDOCK to a restaurant called Shoreline Seafood at 1034 Route 3 in Gambrills, MD. The officers saw FERDOCK pull into a parking lot and take a spot in the front of the lot.

37.     At the same location, at approximately 11:53 a.m., officers observed a silver Honda Accord, Maryland registration 8EJ-P43, pull into the parking lot and park next to FERDOCK's vehicle. A white male identified as Timothy JACOBS exited the vehicle and entered the front passenger seat of FERDOCK's vehicle. JACOBS then handed FERDOCK a brown paper bag. JACOBS exited FERDOCK's vehicle carrying a cooler and got back in his own vehicle. JACOBS and FERDOCK then departed the area. Investigators subsequently determined that the silver Honda Civic, Maryland registration 8EJ-P43, is registered to Timothy Joseph JACOBS at 896 Harwood Road in Harwood, MD.

38.     Shortly after the meeting between JACOBS and FERDOCK, at approximately 12:15 p.m., the United States intercepted an incoming call from FERDOCK to CAIN. During the call, FERDOCK told CAIN to give him half an hour, and CAIN agreed.

39.     Based on my training, knowledge, and experience, I have interpreted the call described above as follows: (1) FERDOCK had procured the kilogram shipment of cocaine that CAIN agreed to purchase, and (2) FERDOCK was going to bring the shipment to CAIN in half an hour.

40.     Law enforcement officers maintained surveillance of FERDOCK

22

following his meeting with JACOBS. During this time, the United States intercepted the call described above, in which FERDOCK indicated that he was delivering the kilogram shipment to CAIN. Officers subsequently initiated a traffic stop of FERDOCK as he reached the intersection of Veterans Highway and East West Boulevard in Millersville, MD. During the stop, officers conducted a K-9 scan of FERDOCK's vehicle. The scan alerted positive for the presence of narcotics. Officers then searched FERDOCK's vehicle and discovered one kilogram of cocaine, wrapped in a brown paper bag and brown tape, as well as two and half additional ounces of cocaine, packaged in separate denominations and prepared for distribution.

41.     Following the search of FERDOCK's vehicle, law enforcement officers took FERDOCK into custody and transported him to the Anne Arundel County Police Department, Western District. At the Western District, the officers advised FERDOCK of his Miranda rights, interviewed him briefly, and released him pending indictment.

42.     Law enforcement officers also took the suspected cocaine that they recovered from FERDOCK's vehicle to the Western District for testing. The testing confirmed that the suspected cocaine was, in fact, cocaine. Following the testing, the officers submitted the cocaine to the Anne Arundel County Police Department drug lab for safe keeping.

43.     Prior to the above-referenced transaction between FERDOCK and JACOBS, law enforcement officers installed a pole camera to monitor JACOBS' residence at 896 Harwood Road, Harwood, MD 20776. On May 24, 2013, at

23

approximately 11:31 a.m., the camera captured images of JACOBS' silver Honda Accord

leaving JACOBS's residence. At approximately 3:53 p.m., the camera captured images of

the silver Honda Accord returning to JACOBS's residence. As noted above, officers

conducting surveillance observed JACOBS driving the silver Honda Accord, Maryland

registration 8EJ-P43, while meeting with FERDOCK at Shoreline Seafood to sell him

one kilogram of cocaine.

45. Following the transaction between FERDOCK and JACOBS, the United

States intercepted a series of calls between CAIN and REXRODE. During the calls,

CAIN and REXRODE discussed the kilogram shipment of cocaine, which by that time

had been intercepted by law enforcement. They also discussed strategies for locating

FERDOCK and confronting him about the missing shipment.

45. On May 26, 2013, at approximately 8:58 p.m., the United States

intercepted an outgoing call from CAIN to REXRODE. During the call, CAIN explained

that "we got over here," but "he's already gone." Later during the call, REXRODE stated

that "we need to yank him fast so he don't, so he don't spend it." REXRODE further told

CAIN that "hey, look, if you got to stay up all night and find this motherfucker, we need

to find him."

46. Based on my training, knowledge, and experience, I have interpreted the

conversation described above as follows: (1) CAIN and an unidentified third party were

attempting to find FERDOCK and confront him about the missing shipment of cocaine;

and (2) REXRODE told CAIN that it was important to find FERDOCK quickly, before

24

FERDOCK spent the money that CAIN had paid to FERDOCK for the missing shipment.

47.      At the time of the call described above, law enforcement officers were conducting surveillance at 8387 Baltimore Annapolis Boulevard (FERDOCK's residence, a subject premises described herein).  At approximately 9:05 p.m., the officers observed a white van with "Commercial Building Services" written on the side (a subject vehicle described herein).  The officers followed the van from FERDOCK's residence to a bar called Bamboo Bernie's, which is located at 8539 Baltimore Annapolis Boulevard. The van pulled into a parking lot at the bar and quickly departed the area.  Officers followed the van to a Citgo gas station at 8445 Fort Smallwood Road in Pasadena.  At the gas station, officers observed two white males, identified as Paul CAIN and David REXRODE (Daryell REXRODE's brother), exit the van.  After fueling their vehicle, CAIN and David REXRODE got back into the van and drove to the Brass Rail Pub.

48.      Officers established surveillance inside the Brass Rail Pub, where they observed CAIN meeting with David and Daryell REXRODE.  The officers then observed CAIN and DAVID REXRODE leaving the bar together in the same white van (i.e., the van with "Commercial Building Services" written on the side) in which they had arrived at the bar.  The officers followed CAIN and David REXRODE as they drove around the Pasadena area.  They eventually returned to the Brass Rail Pub.

49.      Later that evening, officers observed CAIN, Daryell REXRODE, David REXRODE, and an unknown female leaving the Brass Rail Pub.  David REXRODE and the unidentified female got into the white van, Daryell REXRODE got onto a motorcycle,

25

and all three returned to Daryell REXRODE's residence at 8052 Croydon Way (a subject premises described herein). CAIN got onto a Harley-Davidson motorcycle, Maryland registration 6D499, and returned to his residence. When CAIN returned to his residence, officers observed him meeting with GARDNER in the street.

50.    On May 26, 2013, at approximately 11:21 p.m., The United States intercepted an incoming call from REXRODE to CAIN. During the call, REXRODE told CAIN to "come past my house and pick David up." CAIN agreed. Based on my training, knowledge, and experience, I believe that during this call, REXRODE was instructing CAIN to come by his house and pick up his brother, David REXRODE.

51.    At the time of the call describe above, law enforcement officers were conducting surveillance of CAIN at his residence. The officers saw CAIN getting into his 2000 Ford pickup, Maryland registration 11S-245 (a subject vehicle described herein). The officers followed CAIN as he drove to REXRODE's residence at 8052 Croydon Way. When CAIN arrived at REXRODE's residence, the officers saw David REXRODE walk outside and enter the passenger side of CAIN's vehicle.

52.    Based on the conversations and surveillance described above, law enforcement officers suspected that CAIN and David REXRODE intended to go to FERDOCK's residence for the purpose of confronting FERDOCK about the missing kilogram shipment of cocaine. Law enforcement therefore attempted to intercept CAIN and David REXRODE before they got to FERDOCK's home. The officers arrived too late, however, and CAIN was able to pull into FERDOCK's driveway, where he left

26

David REXRODE in the woods on FERDOCK's property. As the officers arrived, CAIN was making a u-turn and pulling out of FERDOCK's driveway. The officers initiated a traffic stop of CAIN, but they let him go without issuing a citation.

53.     On May 26, 2013, at approximately 11:51 p.m., the United States intercepted an outgoing call from CAIN to REXRODE. During the call, CAIN recounted that he had just dropped off David REXRODE at FERDOCK's residence, and that he was pulled over law enforcement officers after leaving FERDOCK's property. CAIN stated that, as a result of the traffic stop, "they [i.e., law enforcement] fuckin' definitely knew that my truck was there." Daryell REXRODE responded "that's good, 'cause they saw you leave." Daryell REXRODE further explained that his brother, David, was going to wait for FERDOCK at his residence for four hours.

54.     Based on my training, knowledge, and experience, I believe that during this call, CAIN told REXRODE, among other things, that he was concerned that police officers had seen his truck at FERDOCK's residence.

55.     In the early morning hours of May 27, 2013, Anne Arundel County Police officers flew a helicopter over FERDOCK's property. An officer inside the helicopter attempted to use a forward-looking infrared scanning device (FLIR) to identify David REXRODE by his heat signature. Officers on the ground subsequently located REXRODE in the woods and placed him under arrest for trespassing. At the time of his arrest, David REXRODE was carrying latex gloves, a blunt object that officers described as a mallet, a knife, and a roll of duct tape.

27

56.     David REXRODE appeared before an Anne Arundel County commissioner on May 27, 2013. He was released later that day on his own recognizance.

57.     On May 27, 2013, at approximately 11:20 a.m., the United States intercepted an outgoing call from CAIN to Daryell REXRODE. During the call, Daryell REXRODE informed CAIN that David REXRODE had been "locked up" the previous evening for trespassing. Daryell REXRODE then stated that he and CAIN were going to "get him," i.e., FERDOCK, "today." REXRODE cautioned, however, that CAIN should not "crack down" on "him," i.e., FERDOCK, "because if you do he's gonna run."

58.     Based on my training, knowledge, and experience, I have interpreted the conversation described above as follows: (1) REXRODE was informing CAIN that his brother David had been arrested on FERDOCK's property the previous evening; and (2) REXRODE was explaining to CAIN that they should still attempt to locate FERDOCK and confront him about the missing shipment, but the CAIN should not "crack down" on FERDOCK, because if FERDOCK got scared, he would flee the area.

59.     On May 27, 2013, at approximately 12:24 p.m., the United States intercepted an incoming call from Daryell REXRODE to CAIN. During the call, Daryell REXRODE handed the phone to David REXRODE, who asked CAIN to pick him up at "Crossroads" in Glen Burnie, MD. CAIN agreed.

60. Following the May 27, 2013 conversations between CAIN, Daryell REXRODE, and David REXRODE, law enforcement officers arrested FERDOCK and charged him in state court with possession with intent to distribute cocaine. The basis for

the charge is the May 24, 2013 traffic stop described above, during which law enforcement seized approximately one kilogram and two and a half additional ounces of cocaine from FERDOCK's vehicle. FERDOCK posted bail the following day.

### D. Additional Conversations Between CAIN and Darvell REXRODE

61.    On May 23, 2010, at approximately 1:10 p.m., the United States intercepted an incoming call from REXRODE to CAIN. During the call, REXRODE told CAIN that he had just spoken with his "black buddy," and that he (REXRODE) was going to meet him (the "black buddy") at 8:00 p.m. that evening. CAIN acknowledged REXRODE's statement. He then asked about their (his and REXRODE's) "other buddy." REXRODE responded that "they" were supposed to be coming after Friday with "the whole thing."

62.    Later during the same call, CAIN told REXRODE that he had also spoken with someone, and that he wanted to talk to REXRODE about the conversation. REXRODE told CAIN that "they" could have "them" tonight, but that he (REXRODE) could still cancel. REXRODE explained that "he swore they were straight," and that he (REXRODE) would not take "them" if they weren't. CAIN told REXRODE to take them if they were straight, "because the last ones we got were a little chopped up." REXRODE agreed, and he explained to CAIN that when people pay too much, "they" start playing with "it."

63.    Later during the call, REXRODE explained that he (REXRODE) had told his buddy that he did not mind paying a high price in exchange for something good.

29

CAIN responded that that would work. He further stated that he (CAIN) had spoken with "a friend of mine" the previous night, and that the friend was supposed to provide CAIN and REXRODE with "a whole one." CAIN stated that he did not know the price yet but would find out later that day. REXRODE acknowledged CAIN's statement, and he told CAIN that they (CAIN and REXRODE) should take "anything they [could] get their hands on as inventory." CAIN agreed.

64.    Later during the same call, REXRODE stated that he was uncertain as to what would happen with the "one guy" because he (the "one guy") had "come all the way here with a box and the box ain't got what it's supposed to have in it." CAIN then asked REXRODE whether he had gotten his money back. REXRODE told CAIN that he had. REXRODE further stated that he was going to meet someone at 8:00 p.m. that evening at a house belonging to one of his workers. CAIN acknowledged REXRODE's statement, and he told REXRODE that he would call him at 7:00 p.m., after he (CAIN) had determined what was going to happen with "this guy," and what kind of price he (CAIN) was going to be able to get. REXRODE agreed, and he told CAIN that he would "leave this intact," but that he could always "come up short" and "come home with nothing" if he had to.

65.    Based on my training, knowledge, and experience, I have interpreted the call described above as follows: (1) REXRODE had spoken with two separate sources of supply; (2) one of REXRODE's sources had a shipment of narcotics that would arrive sometime after Friday; (3) REXRODE could also get narcotics from another source that

evening; (4) CAIN and REXRODE had purchased a previous shipment that was cut and very weak; (5) the source of supply who had provided that weak shipment had informed REXRODE that the upcoming shipment would be better; (6) CAIN had spoken with yet another source [i.e., FERDOCK] who would be providing CAIN and REXRODE with one kilogram of cocaine for an undetermined price; (7) CAIN and REXRODE were attempting to stockpile as much cocaine as they could; (8) CAIN and REXRODE had previously received another shipment of narcotics that did not contain the correct amount; (9) REXRODE intended to meet a source of supply at 8:00 p.m. that evening; and (10) REXRODE would not purchase narcotics from the source if he did not like the source's product.

66.     On May 27, 2013, at approximately 3:18 p.m., the United States intercepted an outgoing call from CAIN to REXRODE. During the call, CAIN told REXRODE to hang up and answer his phone because CAIN would be calling from another number. Based on my training, knowledge, and experience, I believe that during this call, CAIN was informing REXRODE that he was using a new telephone number.





**Tip Line Complaint Involving REXRODE**

70.     On May 25, 2013, the Anne Arundel County Police Department received a

complaint on its narcotics tip line regarding drug trafficking activity in the Pasadena, MD

area. The complainant stated that Daryell REXRODE was selling narcotics from his

residence, which, as noted above, is located at 8052 Croydon Way, Pasadena, MD,

21122. The complainant further stated that s/he had observed REXRODE exiting his

residence and entering the back of his vehicle, which the complainant described as a

white van with "Commercial Building Services" written on the side. The complainant

then saw REXRODE conduct a suspected drug transaction with an unknown individual

whom REXRODE had met at his residence.

## Dispute Between REXRODE and Neighbor

71.     On July 17, 2013, the Anne Arundel Police Department received a complaint from REXRODE's neighbor. The neighbor stated that REXRODE had threatened his/her spouse, and that REXRODE and the spouse were about to fight. Later during the call, the neighbor told the dispatcher that REXRODE had gone into his house carrying two bags that the neighbor believed contained narcotics.

72.     Later that evening, an Anne Arundel County police officer contacted the neighbor who had made the complaint regarding REXRODE. The neighbor and his/her spouse told the officer that they had no direct knowledge that REXRODE was carrying narcotics in the bags he brought into his residence. The neighbor and his/her spouse told the officer, however, that they had observed REXRODE conducting suspected drug transactions in front of his house in the past.

## IV.    THE SPECIFIC SEARCH LOCATIONS

### a.  Paul CAIN, Julie GARDNER, and 8469 Kenton Road, Pasadena, MD 21122

73.     A subscriber information request sent to BG&E revealed that utility services for 8469 Kenton Road, Pasadena, MD, 21122, have been listed in the name of Melvin L. CAIN since May 1, 1961.

74.     A search of motor vehicle records for Paul CAIN, however, lists his address as 8469 Kenton Road, Pasadena, MD 21122.

75.     A search of motor vehicle records for Julie GARDNER lists her address as 214 Delaware Avenue, Pasadena, MD, 21122.

76.     According to the Accurint database, however, GARDNER's address is 8469 Kenton Road, Pasadena, MD 21122.

77.     As noted previously, law enforcement believes that GARDNER is CAIN's girlfriend. During this investigation, the United States has intercepted multiple telephone calls between CAIN and GARDNER establishing that GARDNER is knowingly assisting CAIN in connection with his drug trafficking activities. *See* pages 16-18, *supra*. On more than one occasion, GARDNER has provided such assistance from 8469 Kenton Road. For example, during one call, CAIN asked GARDNER, who was "home" at the time, to procure 14 grams of cocaine and package it for distribution. During another call, CAIN asked GARDNER to wait on the front porch because a customer would soon be coming by the home.

78.     Law enforcement officers have also conducted surveillance of CAIN at the 8469 Kenton Road address. *See* pages 25-26, *supra*. On one such occasion, the officers saw CAIN and GARDNER meeting in the street. *See* page 25, *supra*.

79.     Based on the evidence collected during this investigation, and based on my training, knowledge, and experience, I believe that there is currently further evidence relating to CAIN's and GARDNER's unlawful drug trafficking activities secreted inside **8469 Kenton Road, Pasadena, MD 21122**, including inside any outbuildings or sheds located on the property.

34

### b. Daryell REXRODE and 8052 Croydon Way, Pasadena, MD 21122

80.    A subscriber information request sent to BG&E revealed that the utility services for 8052 Croydon Way, Pasadena, MD 21122 have been listed in the name of Daryell Mitchell REXRODE since March 17, 2009.

81.    A search of motor vehicle records for Daryell REXRODE, however, lists his address as 525 Kent Circle, Glen Burnie, Maryland 21060.

82.    As noted previously, *see* page 10, *supra*, REXRODE was arrested upon arriving to accept a controlled delivery of a package containing one kilogram of cocaine in November 2012. Following his arrest, REXRODE told the arresting officers that he was going to bring the package back to his residence, where he intended to split the package with CAIN. Further, on May 25, 2013, law enforcement officers received an anonymous tip that REXRODE was distributing narcotics in front of his residence. *See* pages 32-33, *supra*. Finally, on July 17, 2013, the police received a complaint from REXRODE's neighbor, who observed REXRODE carrying two bags into his residence. The neighbor and his/her spouse told a police officer that they believed that the bags contained narcotics. As noted previously, the neighbor and spouse did not have direct evidence that the bags contained narcotics. They had, however, observed REXRODE conducting suspected narcotics transactions in front of his house on prior occasions.

83.    Based on the evidence collected during this investigation, and based on my knowledge, training, and experience, I believe that there is currently further evidence relating to

Daryell REXRODE's unlawful drug trafficking activities secreted inside **8052 Croydon Way, Pasadena, MD 21122**, including inside any outbuildings or sheds located on the property.

### c. Allan FERDOCK and 8387 Baltimore Annapolis Boulevard, Pasadena, MD 21122

84.     A subscriber information request sent to BG&E revealed that the utility services for 8387 Baltimore Annapolis Boulevard, Pasadena, MD 21122 have been listed in the name of Jimmy Fisher since February 01, 1969.

85.     A search of motor vehicle records for FERDOCK lists his address as 1636 Colony Road, Pasadena, MD 21122.

86.     As noted above, however, *see* pages 21-23, *supra*, law enforcement officers conducted surveillance of FERDOCK at the Baltimore Annapolis Boulevard address on May 24, 2013. On that date, at approximately 11:30 a.m., the officers followed FERDOCK as he drove in his **2000 Black Jeep Cherokee** to the Shoreline Seafood Restaurant in Gambrills, MD. At the restaurant, the officers watched FERDOCK obtain one kilogram of cocaine from Timothy JACOBS in the parking lot. A few minutes later, the officers initiated a traffic stop of FERDOCK and placed him under arrest.

87.     Officers also conducted surveillance of FERDOCK's residence on the evening of May 26-27, 2013. *See* pages 25-27, *supra*. As noted previously, officers tried, but failed, to intercept Paul CAIN and David REXRODE before CAIN dropped off REXRODE at FERDOCK's home. Later that evening, the officers arrested REXRODE in the woods near FERDOCK's residence. At the time of his arrest, David REXRODE was carrying latex gloves, a mallet, a knife, and a roll of duct tape.

36

88.     The government is not aware of any location other than 8387 Baltimore Annapolis Boulevard (e.g., a place of employment) where FERDOCK resides or spends significant amounts of time. Further, during the course of this investigation, officers have observed FERDOCK leaving his house and traveling to locations in the Pasadena area to conduct suspected narcotics transactions with individual customers.

89.     Based on the evidence collected during this investigation, and based on my training, knowledge, and experience, I believe that there is currently further evidence of FERDOCK's unlawful drug trafficking activities secreted inside **8387 Baltimore Annapolis Boulevard, Pasadena, MD 21122**, including inside any outbuildings or sheds located on the property.

### d.  Randall CAIN and 25 Lake Shore Drive, Pasadena, MD 21122

90.     A subscriber information request sent to BG&E revealed that the utility services for 25 Lake Shore Drive, Pasadena, MD 21122 have been listed in the name of Darla C. Rucker since September 11, 2006.

91.     A search of motor vehicle records for Randall CAIN, however, lists his address at 25 Lake Shore Drive, Pasadena, MD 21122.

92.     As noted previously, law enforcement officers have intercepted calls between Paul and Randall CAIN in which Randall CAIN asked Paul CAIN to deliver a quantity of narcotics to his (Randall CAIN's) house. *See* pages 18-19, *supra.* Following those calls, officers conducting surveillance observed Paul CAIN and Julie GARDNER arriving at the Lake Shore address in Paul CAIN's **2000 green Ford truck**. Paul CAIN, Randall CAIN, and GARDNER

then met for less than five minutes in the driveway. *See id.* Following this meeting, the officers observed Randall CAIN walking back into 25 Lake Shore Drive.

93.     Based on the evidence collected during this investigation, and based on my training, knowledge, and experience, I believe that there is currently further evidence relating to Randall CAIN's unlawful drug trafficking activities secreted inside **25 Lake Shore Drive, Pasadena, MD 21122**, including inside any outbuilding or sheds located on the property.

**e. The Green Ford Truck**

94.     As noted previously, this vehicle is a 2000 green Ford pickup truck bearing Maryland registration 11S245 and registered to Paul CAIN. Officers have observed CAIN operating this vehicle while en route to a suspected drug transaction at Randall CAIN's residence, *see* pages 18-19, *supra*; and also while transporting David REXRODE to FERDOCK's residence on the evening of May 26-27, 2013, *see* pages 26-27, *supra.* Further, while conducting surveillance of Paul CAIN's residence at **8469 Kenton Road, Pasadena, MD 21122**, officers have observed the green Ford truck parked outside the home.

**f. The Black Jeep Cherokee**

95.     As noted previously, this vehicle is a 2000 Jeep Cherokee, bearing Maryland registration 2AS1176 and registered to Allan FERDOCK. Officers have observed FERDOCK operating this vehicle while en route to a drug transaction with Timothy JACOBS at Shoreline Seafoood on May 24, 2013. *See* pages 21-23, *supra.* Further, while conducting surveillance of FERDOCK's residence at **8387 Baltimore Annapolis Boulevard, Pasadena, MD 21122**, officers have observed the black Jeep Cherokee parked outside the home.

38

### g. The White Ford Van

96.     As noted above, this vehicle is a 2000 white Ford van, with "Commercial Building Services" written on the side, bearing Maryland registration 42J169 and registered to Daryell REXRODE.  Officers observed REXRODE operating this vehicle while transporting his brother, David REXRODE, from the Brass Rail Pub to the **8052 Croydon Way** address on May 26, 2013.  Further, while conducting surveillance of Daryell REXRODE's residence at **8052 Croydon Way, Pasadena, MD 21122**, officers have observed the white Ford van parked outside the home.

## V.     CONCLUSION

97.     Based on the information set forth in this affidavit, I believe that sufficient probable cause exists to believe that there is evidence of the following in the SUBJECT LOCATIONS and VEHICLES:

> a.  distribution of cocaine and possession with intent to distribute cocaine, in violation of 21 U.S.C. § 841(a)(1);
>
> b.  conspiracy to distribute and to possess with intent to distribute cocaine, in violation of 21 U.S.C. § 846.

98.     In addition, due to the prevalence of cellular telephones in this investigation; and based on my training, knowledge, and experience, which indicate that drug traffickers utilize cellular telephones, communication devices, and other electronic media storage in furtherance of their unlawful activities, I seek permission to search any cellular telephone or mobile device seized while searching the SUBJECT LOCATIONS and VEHICLES for recent calls, contacts,

39

address books, text messages, voicemail messages, email, photographs and other forms of communication. I know that this information is often temporarily stored in cellular telephones, and that there exist technologies whereby a remote user can delete information sought by law enforcement from a cellular telephone.

99.    WHEREFORE, in consideration of the facts presented, I respectfully request that this Court issue search warrants for the SUBJECT LOCATIONS and VEHICLES for the items listed on Attachment A, which constitute fruits, evidence and instrumentalities of distribution, possession with intent to distribute and conspiracy to distribute and possess with intent to distribute cocaine, in violation of 21 U.S.C. §§ 841(a)(1) and 846.


_____
Special Agent Matthew P. Lucik
Drug Enforcement Administration


Sworn to before me this __19__ day of July, 2013 at __5:55__ hours.


_____
The Honorable Susan K. Gauvey
United States Magistrate Judge


40

## ATTACHMENT A

1. Books, records, receipts, notes, ledgers and other papers relating to the transportation, ordering, purchasing and distribution of controlled substances, in particular, cocaine, and for records, images and items revealing relationships between organization members.

2. Books, records, receipts, bank statements and records, passbooks, letters of credit, money orders and cashiers' checks, safe deposit keys, items of storage such as safes and lock boxes, international money wires/transfers and other items evidencing the obtaining, secreting, transfer, concealment and/or the expenditure of money.

3. Address and/or telephone books, any papers reflecting names, addresses, telephone numbers or pager numbers indicating relationships among the listed co-conspirators in the affidavit which are associated with the dealing of illegal controlled substances.

4. United States currency, precious metals, jewelry and financial instruments, as well as evidence of the acquisition of property and other assets, including but not limited to real estate, stocks, bonds and other types of financial investments, vehicles and other tangible goods.

5. Photographs, in particular, photographs of co-conspirators, of assets, firearms and/or controlled substances.

6. Indicia of occupancy, residency, and ownership of the premises described in said affidavit, including, but not limited to, utility and telephone bills, canceled envelopes, and keys.

7. Cellular phones, pagers, beepers, or other electronic communications devices.

8. Travel records, including but not limited to: passports, visas, airline tickets, boarding passes, and airline ticket receipts.

9. Controlled substances, including but not limited to cocaine, dilutants, scales, packaging materials used to package cut, dilute or package cocaine and any other controlled substances and their related paraphernalia.